## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEVILLE, RODIE AND SHAW, INC.,<br>    *Plaintiff*,<br><br>    v.<br><br>E.A. PRESCOTT LEGARD, AS<br>EXECUTOR OF THE ESTATE OF EDWIN<br>F. LEGARD, JR.,<br>    *Defendant.* | No. 3:23-cv-266 (VAB) |

### RULING AND ORDER ON CROSS MOTIONS FOR JUDGMENT ON THE PLEADINGS

Neville, Rodie and Shaw, Inc. ("NRS," "Corporation," or "Plaintiff") has sued E.A. Prescott LeGard ("Executor" or "Defendant"), as Executor of the Estate of Edwin F. LeGard, Jr. ("Estate"). NRS seeks enforcement of a 2003 Shareholders' Agreement, which, it claims, entitles it to purchase the stocks owned by Edwin F. Legard, Jr. ("Decedent") at Book Value. Compl., ECF No. 1 ¶ 37 (Feb. 28, 2023) ("Compl.").

Both NRS and the Executor have moved for judgment on the pleadings. *See* ECF No. 21 (June 14, 2023); ECF No. 24 (July 14, 2023).

For the following reasons, the Court **GRANTS** NRS's motion for judgment on the pleadings and **DENIES** the Executor's cross-motion for judgment on the pleadings.

### I.    FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

#### A.  Factual Allegations

Before his death, the Decedent allegedly owned 20 shares of common stock in NRS ("Decedent's Shares"). Compl. ¶ 4.

On or about December 22, 2003, the owners of all of the common stock of NRS

("Shareholders"), including the Decedent, allegedly entered into a restated Shareholders' Agreement ("Agreement"). *Id.* ¶ 9.

Section 2(A) of the Agreement allegedly provides for the rights and obligations of NRS in the event of a Shareholder's death. *Id.* ¶ 10. Section 2(A) allegedly states:

> Upon the death of any Shareholder, the Corporation shall have the obligation to purchase all of the decedent's shares as soon thereafter as is practicable. The purchase price shall be the Book Value of the shares as of the end of the fiscal year completed prior to the date of the shareholder's death after the audit for such year has been finalized.

> The purchase price for a deceased shareholder's shares may be payable in cash or, at the option of the Corporation, half in cash at the time of purchase and the balance by a promissory note, payable in equal semi-annual installments for a period of one year thereafter, bearing interest at five percent (5%) per annum or as otherwise agreed.

> If the Corporation is unable to purchase the decedent's shares because the Corporation does not have sufficient surplus, the surviving Shareholders shall have the right to purchase all of the decedent's stock within 60 days of the death of the shareholder, on a pro rata basis or on any other basis on which they agree, at Book Value. If the surviving Shareholders do not exercise their right to purchase the decedent's shares, the Corporation shall have the obligation to accumulate surplus or reduce capital so that it can legally purchase the decedent's shares from his estate in accordance with this paragraph, and until such purchase, the Corporation shall (i) declare no dividends and (ii) limit the payment of salaries and bonuses to Shareholders to not more than 80% of the estimated net income (prior to payment of any salaries or bonuses).

> If a deceased shareholder's shares are not purchased by the Corporation (or the other Shareholders) within one year from the date of death, the legal representatives and/or beneficiaries or heirs shall have the right to sell such shares, but the Corporation's obligation to purchase such shares shall continue in effect until such shares are sold, at which time its obligation shall expire without liability of any kind to the Corporation. The person or persons to whom such shares are assigned, sold or pledged shall execute an instrument substantially in the form of Exhibit A hereto (a copy of which shall be delivered to each party to this Agreement).

Ex. C to Attachments to Mot. for J. on the Pleadings, ECF No. 22-3 (June 14, 2023); Ex. B to Mem. of L. in Opp'n to Pl.'s Mot. for J. on the Pleadings and in Support of Def's. Cross-Mot. for J. on the Pleadings at 3–4, ECF No. 24-1 (July 14, 2023).

The Decedent allegedly died on or about September 23, 2022. *Id.* ¶ 2.

After his death, the Corporation allegedly communicated with the Executor regarding the

Corporation's obligation to purchase the Decedent's Shares in accordance with the Agreement. Compl. ¶ 23.

The Corporation allegedly provided the Executor with financial information, including the per share Book Value for the fiscal year ending in 2021. *Id.* ¶ 24.

The Book Value of the Decedent's shares at the end of fiscal year 2020–21 was allegedly $15,204.06 per share, or $304,081.20 in total. *Id.* ¶¶ 25–26.

The Corporation allegedly demanded that the Executor sell the Decedent's Shares back to the Corporation at Book Value. *Id.* ¶ 28.

The Executor has allegedly refused to sell the Decedent's Shares back to NRS at Book Value and maintains that it is entitled to remain a shareholder of NRS or to sell or transfer the Shares to a third party. *Id.* ¶ 30.

      B.  <u>Procedural History</u>

On February 28, 2023, NRS filed the Complaint. Compl.

On May 5, 2023, the Executor filed its Answer. ECF No. 16 ("Answer").

On June 14, 2023, NRS filed a motion for judgment on the pleadings, including a memorandum of law and supporting documentation. Mot. for J. on the Pleadings, ECF No. 21 ("NRS Mot."); Attachments to Mot. for J. on the Pleadings, ECF No. 22 ("NRS Attachments"); Mem. of L. in Support of Pl.'s Mot. for J. on the Pleadings, ECF No. 23 ("NRS Mem.").

On July 14, 2023, the Executor filed a cross-motion for judgment on the pleadings, including a memorandum of law and supporting documentation. Mot. for J. on the Pleadings, ECF No. 24 ("Executor Mot."); Mem. of L. in Opp'n to Pl.'s Mot. for J. on the Pleadings and in Support of Def.'s Cross-Mot. for J. on the Pleadings, ECF No. 24-1 ("Executor Mem.").

On July 14, 2023, NRS filed a memorandum of law in further support of its motion for

judgment on the pleadings. Mem. of L. in Further Support of Pl.'s Mot. for J. on the Pleadings and in Opp'n to Def's. Cross-Mot. for J. on the Pleadings, ECF No. 25 ("NRS Reply").

On August 18, 2023, the Executor filed a reply in support of its cross-motion for judgment on the pleadings. Reply Mem. of L. in Support of Def's. Cross-Mot. for J. on the Pleadings, ECF No. 26 ("Executor Reply").

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, the Court applies the same standard applicable to motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). Accordingly, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* A court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff has stated a claim upon which relief may be granted, such that it should be entitled to offer evidence to support its claim. *See id.* (citation omitted).

While a court must accept as true the allegations in a complaint, this requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked

4

assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

In determining a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), "the court may consider any of the pleadings, including the complaint, the answer, and any written instruments attached to them." 2 Moore's Federal Practice 3D § 12.38 (2016); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (explaining that a court need not convert a motion to dismiss into a motion for summary judgment when it considers "'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference'," and noting that "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint") (quoting *Int'l Audiotext Network, Inc. v. am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

Motions for judgment on the pleadings are especially appropriate in contract cases, where the case turns on legal interpretations of the obligations of the parties. *Ricatto v. M3 Innovations Unlimited, Inc.*, No. 18 CIV. 8404 (KPF), 2019 WL 6681558, at *4 (S.D.N.Y. Dec. 6, 2019). "If the allegations of a pleading 'are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading].'" *Id.* (quoting *In the Matter of the Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015)). "If the contract is unambiguous, the Court may award judgment on the pleadings, assuming no material facts are in dispute." *Neopharm Ltd. v. Wyeth-Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016).

### III.    DISCUSSION

Both parties have moved for judgment on the pleadings and argue that interpretation of the Agreement is the sole issue to be resolved.[1] The parties further agree that interpretation of the Agreement is a matter of law[2] which the Court may properly decide at this stage of the case. NRS Mem. at 6; Executor Mem. at 5. The Court first analyzes the Agreement in light of relevant contract law principles and subsequently considers what remedy might be appropriate.

### A.   The Agreement

A court's primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted).

"When analyzing the meaning of a contractual provision, a threshold question the Court [must] address is whether the contract is ambiguous." *U.S. Bank, N.A. v. Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). A contract is unambiguous when its terms have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Revson v. Cinque*

---

[1] The parties agree that the Decedent owned 20 shares of common stock in NRS, that he signed the Agreement, and that the Agreement is the operative contract governing this dispute.

[2] The parties agree that the Agreement is governed by New York law. *See* Agreement § 9; NRS Mem. at 8 n.4; Estate Mem. at 5 n.1. Accordingly, this section analyzes the Agreement under New York contract law.

*& Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). A contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). A court may not find a contract ambiguous simply because the litigants present alternative interpretations of its terms. *Id.*

        Under New York law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 168 (S.D.N.Y. 2015). In general, courts "should not consider any extrinsic evidence in interpreting an unambiguous contract, and [should] only consider such evidence when contract language standing alone creates an ambiguity." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 531 (S.D.N.Y. 2013) (citing *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). In contrast, when interpreting an ambiguous contract, a court "must examine extrinsic evidence of the parties' intent—which means, in this posture, that the Court would have to deny both cross-motions [for judgment on the pleadings] and proceed to discovery." *Neopharm Ltd.*, 170 F. Supp. 3d at 615.

        "As a general rule, courts must enforce shareholder agreements according to their terms." *In re Dissolution of Penepent Corp., Inc.*, 750 N.E.2d 47, 50 (N.Y. 2001) (citing *Gallagher v. Lambert*, 549 N.E.2d 136, 137–38 (N.Y. 1989)). Shareholder agreements "avoid costly, lengthy litigation" by promoting 'reliance, predictability and definitiveness' in relationships among shareholders in close corporations." *Id.* When interpreting such an agreement, a court should

read "[t]he contract . . . as a whole to determine its purpose and intent, and it should be interpreted in a way [that] reconciles all its provisions, if possible." *Matter of El-Roh Realty Corp.*, 902 N.Y.S.2d 727, 729 (N.Y. App. Div. 2010) (internal quotation marks and citations omitted).

Both parties argue that the Agreement is an unambiguous contract that may be interpreted solely based on its terms and without any consideration of extrinsic evidence, making judgment on the pleadings appropriate. NRS Mem. at 6; Executor Mem. at 5. They present two different interpretations, however, of the following language from Section 2: "Upon the death of any Shareholder, the Corporation shall have the obligation to purchase all of the decedent's shares as soon thereafter as is practicable. The purchase price shall be the Book Value of the shares as of the end of the fiscal year completed prior to the date of the shareholder's death after the audit for such year has been finalized." Agreement § 2(A).

NRS argues that this provision entitles it to purchase the Estate's Shares at Book Value. NRS Mem. at 8. It argues that, according to the unambiguous and non-contradictory terms of the Agreement, "there is no scenario in which the Estate may retain the Decedent's Shares where the Corporation has sought to purchase the Decedent's Shares in accordance with the Agreement." *Id.* at 9.

The Executor argues that the Agreement merely obligates the Corporation to offer or attempt to purchase the Shares at Book Value, while leaving the Shareholder (or Shareholder's legal representative) free to refuse to sell such shares. Executor Mem. at 8. It argues that the phrase, "the Corporation shall have the obligation to purchase all of the decedent's shares as soon thereafter as is practicable[,]" expressly affirms the Corporation's duty to offer to purchase the shares, but leaves open the possibility that the transaction may not be completed for external

reasons, including refusal to sell by the Decedent's legal representative. *Id.* The Executor further argues that "the Agreement foresees the possibility that the Corporation will fail to purchase the shares and allows the Decedent's Legal Representative to continue to own, assign, sell or pledge them[.]" *Id.* at 9 (citing the following provisions of the Agreement: (1) "If a deceased shareholder's shares are not purchased by the Corporation (or the other Shareholders) within one year from the date of death, **the legal representatives and/or beneficiaries or heirs shall have the right to sell such shares, but the Corporation's obligation to purchase such shares shall continue in effect until such shares are sold**, at which time its obligation shall expire without liability of any kind to the Corporation."; (2) "No Shareholder (or legal representative) in restricted categories A, B, or C below shall be permitted to continue to own or to assign, sell or pledge his shares of Common Stock **unless with respect thereto the Corporation or other Shareholders fail to purchase such shares** of Common Stock pursuant to this Agreement." (emphasis added by the Executor)).

NRS replies that the Executor's arguments distort the meaning of the Agreement and that its interpretation is counter to the intent of the Agreement to "restrict[] the free transfer of shares by all Shareholders[.]" NRS Reply at 7. NRS argues that the Executor has selected disparate clauses from the Agreement to make its argument that it has the right to refuse to sell the Shares to the Corporation, in violation of what it views as the clear objective of the Agreement. *Id.*

In response, the Executor argues that the plain language of the Agreement provides only that the Corporation has an obligation to purchase the Decedent's shares, but not that the Estate has an obligation to sell them. Executor Reply at 5. It further argues that NRS relies on ancillary provisions in the Agreement to support its reading of the text at issue, thereby "trying to fabricate an obligation that the four corners of the Agreement do not require." *Id.* at 5–6.

The Court disagrees.

Section 2 of the Agreement outlines various protocols for the transfer of shares upon a shareholder's death, the termination of a shareholder's employment, or a shareholder's proposed assignment, sale, or pledge of shares. *See* Agreement § 2 ("Each Shareholder agrees that the provisions of this Agreement shall govern (i) the ownership by his estate of shares of stock in the event of his death, (ii) the ownership by him of shares of stock in the event he ceases to be employed or otherwise associated with the Corporation for any reason including discharge, with or without cause, (iii) the assignment, sale or pledge of any of his shares of stock by the particular Shareholder."). In each instance, the Agreement limits the ability of shares to be transferred from the Shareholder, granting the Corporation and other Shareholders the right to recover the shares by purchasing them at Book Value; only if the Corporation and other Shareholders decline to exercise this right does any individual Shareholder have the right to transfer the Shares to another party. *Id.* ("No Shareholder (or legal representative) in restricted categories A, B, or C below shall be permitted to continue to own or to assign, sell or pledge his shares of Common Stock unless with respect thereto the Corporation or other Shareholders fail to purchase such shares of Common Stock pursuant to this Agreement."). The Agreement also specifies that its rights and obligations extend to the estate of a Shareholder, in the event of their death. *Id.* ("'Shareholder' as used herein shall include, unless the context otherwise requires, the legal representative of the particular shareholder, in the event of his death. . . . Each Shareholder agrees that the provisions of this Agreement shall govern . . . the ownership by his estate of shares of stock in the event of his death").

The clear purpose of Section 2 of the Agreement is to restrict the transfer of common stock, thereby limiting the class of potential shareholders of NRS. This purpose is reflected in

that Section's title, "Restrictions on Ownership and Transferability of Common Stock," and its introductory text: "No Shareholder (or legal representative) in restricted categories A, B, or C below shall be permitted to continue to own or to assign, sell or pledge his shares of Common Stock unless with respect thereto the Corporation or other Shareholders fail to purchase such shares of Common Stock pursuant to this Agreement."). *See* Agreement § 2.  Section 2, therefore, is a classic mandatory buy-out agreement, whose aim is to prevent the disposition of the decedent's stock to outside interests or entities, as well as to clarify the value of and means for the disposition of any stock in a closely-held corporation.[3] *See, e.g., A Cappione Inc. v. Cappione*, 990 N.Y.S.2d 297, 299–300 (N.Y. App. Div. 2014) ("Here, the shareholders' agreement reflects the shareholders['] desire to establish a market value for their shares, to effectively control the management of the company, for their mutual best interests, and to protect against divisive relationships which would arise if outsiders with incompatible management philosophies gained interest in the company.") (citation and internal quotation marks omitted); *Gallagher*, 549 N.E.2d at 137 ("These provisions, which require an employee shareholder to sell back stock upon severance from corporate employment, are designed to ensure that ownership of all of the stock, especially of the close corporation, stays within the control of the remaining corporate owners-employees; that is, those who will continue to contribute to its successes or failures.").

The Executor urges this Court to find that the Corporation's obligation to purchase the Decedent's Shares at Book Value does not confer any obligation on the part of the Estate to sell the Decedent's Shares. But such an interpretation of the Agreement relies on an artificially narrow reading of certain provisions of the Agreement and would require the Court to ignore the

---

[3] Douglas A. Kahn, *Mandatory Buy-Out Agreements for Stock of Closely-Held Corporations*, 68 MICH. L. REV. 1, 2–3 (1969).

broader context and purpose of the Agreement as a whole. *See Matter of El-Roh Realty Corp.*, 902 N.Y.S.2d at 727 (holding that courts must analyze Shareholder Agreements "as a whole to determine [their] purpose and intent," and that they "should be interpreted in a way that reconciles all [their] provisions, if possible.") (internal punctuation marks omitted); *Chesapeake Energy Corp.*, 773 F.3d at 114 ("The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (internal quotation marks, citation, and alterations omitted).

When the Agreement is read as a whole, the provisions specifically cited by the Executor in support of its position do not withstand scrutiny. For example, the Executor argues that "the Agreement foresees the possibility that the Corporation will fail to purchase the shares and allows the Decedent's Legal Representative to continue to own, assign, sell or pledge them[.]" Executor Mem. at 9. The Executor thus cites the passage discussed above: "No Shareholder (or legal representative) in restricted categories A, B, or C below shall be permitted to continue to own or to assign, sell or pledge his shares of Common Stock unless with respect thereto the Corporation or other Shareholders fail to purchase such shares of Common Stock pursuant to this Agreement." Agreement § 2. But, while this provision of the Agreement does, in fact, foresee the possibility that the Corporation will fail to purchase a Decedent's shares, such failure is clearly not anticipated to be the result of the Decedent's Legal Representative's refusal to relinquish the shares. Rather, the Agreement contemplates the Corporation's potential insolvency and inability to purchase the shares at Book Value. Agreement § 2A ("Upon the death of any Shareholder, the Corporation shall have the obligation to purchase all of the decedent's shares as soon thereafter as is practicable. . . . If the Corporation is unable to purchase the decedent's shares because the Corporation does not have sufficient surplus, the surviving Shareholders shall have the right to

purchase all of the decedent's stock within 60 days of the death of the shareholder"). There is no text in the Agreement conferring on a Decedent's Estate the right to retain the Decedent's Shares, where the Corporation has attempted to buy back the Shares at Book Value.

In short, the general purpose of Section 2 of the Agreement is to limit the transfer rights of shareholders, in order to prevent the free transfer of stock. It would be contrary to the principles of contract interpretation for this Court to read in an implied right of a Decedent's estate to retain or sell the Decedent's stock. *Cf. A Cappione Inc.*, 990 N.Y.S.2d at 300 ("To hold otherwise and permit Cappione to retain his shares due to the asserted noncompliance with the time period set forth in the shareholders' agreement not only would effectively rewrite the parties' agreement and undermine its stated purpose, i.e., to retain managerial control within the closely-held family corporation, but would place the corporation at risk of losing its distributor's license, thereby rendering its stock worthless."); *Gallagher*, 549 N.E.2d at 138 ("The buy-back price formula was designed for the benefit of both parties precisely so that they could know their respective rights on certain dates and avoid costly and lengthy litigation on the 'fair value' issue. . . . Permitting these causes to survive would . . . frustrate the agreement and would be disruptive of the settled principles governing like agreements where parties contract between themselves in advance so that there may be reliance, predictability and definiteness between themselves on such matters."); *In re Dissolution of Penepent Corp., Inc.*, 750 N.E.2d at 50 (explaining that shareholder agreements "promote reliance, predictability and definitiveness" in relationships among shareholders in close corporations) (quoting *Gallagher*, 549 N.E. 2d at 138).

Accordingly, the Court will Grant NRS's motion for judgment on the pleadings.

**B. Specific Performance**

Specific performance is an equitable remedy that serves as an alternative to the award of damages as a means of enforcing a contract. *Hadcock Motors, Inc. v. Metzger*, 459 N.Y.S.2d 634, 636 (N.Y. App. Div. 1983). "A party who seeks specific performance must prove that he has substantially performed his contractual obligations or tendered performance within the time specified in the agreement or within a reasonable time thereafter; that he is ready, willing and able to perform those contractual obligations not yet performed and not waived by the defendant; and that, except where the contract is one for the sale of real property, he has no adequate remedy at law." *Id.* Generally, specific performance is not awarded in cases where monetary damages are sufficient to protect the expectation interest of the injured party. *Sokoloff v. Harriman Estates Dev. Corp.*, 754 N.E.2d 184, 188 (N.Y. 2001) (citing Restatement Second of Contracts § 359(1)). It is proper in cases where "the subject matter of the particular contract is unique and has no established market value" or where the contract involves goods that are "unique in kind, quality or personal association" where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure. *Van Wagner Adv. Corp. v. S & M Enters.*, 492 N.E.2d 756 (N.Y. 1986); Restatement Second of Contracts § 360, Comment c. Trial courts retain significant discretion in deciding whether to award specific performance in a given case. *See Sokoloff*, 754 N.E.2d at 188; *Estate of Collins v. Tabs Motors of Valley Stream Corp.*, 156 N.Y.S.3d 711, 711 (N.Y. Sup. Ct. 2021).

In the context of shareholder agreements, New York courts regularly grant specific performance as a means of enforcing buy-sell provisions. *Estate of Collins*, 156 N.Y.S.3d at 711 (finding that, because the buy-sell provision of the shareholder agreement was "enforceable and fundamentally fair" and because monetary damages would be an insufficient remedy, specific performance was appropriate); *Johnsen v. ACP Distribution, Inc.*, 814 N.Y.S.2d 142, 147 (N.Y.

14

App. Div. 2006) (ordering specific performance of the stockholder's agreement, which required the petitioner to sell the stock at issue to the company or other shareholders, if either exercised their right of first refusal as provided by the agreement); *Doniger v. Rye Psychiatric Hosp. Ctr., Inc.*, 505 N.Y.S.2d 920, 924 (N.Y. App. Div. 1986) (affirming the trial court's grant of "specific performance of the shareholders' agreement such that the petitioners were directed to transfer their shares in the corporation to the individual respondents").

Here, Section 5 of the Agreement states:

The shares of Common Stock of the Corporation cannot be readily purchased or sold in the open market, and for that reason, among others, the parties hereto will be irreparably damaged in the event that this agreement is not specifically enforced. Therefore, in the event of any controversy concerning the right or obligation to purchase or sell any of the shares of Common Stock, such right or obligation shall be enforceable in a court of equity by specific performance shall, however, be cumulative, and shall be in addition to any other remedy which the parties may have.

NRS argues that specific performance is appropriate in this case because it is specifically contemplated by the Agreement and because it is the only way to enforce the Agreement. NRS Mem. at 11–12. It further argues that it has made multiple attempts to purchase the Decedent's Shares at Book Value (which it alleges is equal to $15,204.06 per share, or $304,081.20 total), and that it has therefore demonstrated that it is willing to perform its contractual obligations.

The Executor has not submitted any briefing regarding the proper remedy, in the event that the Court granted NRS's motion. Similarly, it has not submitted any briefing suggesting that it disagrees with NRS's allegations regarding the Book Value of the Shares.

The Court agrees with NRS.

As described above, New York caselaw suggests that specific performance is appropriate in cases involving enforcement of buy-sell provisions of shareholder agreements, especially in closely held corporations whose stock cannot be readily purchased on the open market. Moreover, Section 5 of the Agreement specifies that controversies regarding rights or obligations

15

to sell any shares shall be remedied by specific performance. *See In re Dissolution of Penepent Corp., Inc.*, 750 N.E.2d at 50 (Courts generally "must enforce shareholder agreements according to their terms.").

Accordingly, the Court will order specific performance. The Executor is ordered to sell the Decedent's Shares to NRS at Book Value.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS** NRS's motion for judgment on the pleadings and **DENIES** the Executor's cross-motion for judgment on the pleadings.

Consistent with this Ruling and Order, the Executor shall sell the Decedent's Shares to NRS at Book Value.

Following the issuance of this judgment, the Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at New Haven, Connecticut, this 16th day of February, 2024.

  */s/ Victor A. Bolden*
Victor A. Bolden
United States District Judge